## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

I, Brandon Amerine, being duly sworn, hereby depose and state the following:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2019. I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("NSGTF"). The primary mission of the NSGTF is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in communities north of Boston. My responsibilities include the investigation of possible violations of federal law, including illegal possession of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.

2. As an FBI Special Agent, I have participated in gang and narcotics investigations and debriefed or participated in the debriefings of defendants, informants, and witnesses who had personal knowledge of narcotics trafficking and gang organizations. I have participated in many aspects of narcotics investigations, including conducting physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, analyzing information obtained through court-ordered pen registers and trap and trace intercepts, overseeing the activities of and debriefing informants, and executing arrest and search warrants. I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses. As such, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, dispense, import, export, and use controlled substances such as methamphetamine, fentanyl, cocaine, and other controlled

substances. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl, cocaine, cocaine base, and illicit pills.

3. Based on my training and experience, I am aware that drug and firearm traffickers commonly use cellular telephones and social media accounts to communicate and further their illegal activities. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages or social media applications in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## PURPOSE OF AFFIDAVIT

4. The FBI Boston NSGTF is investigating members of the transnational criminal organization 18th Street Gang ("18SG") operating in and around the north shore area of Boston, including Everett, Chelsea, Revere, East Boston, and Lynn. Specifically, the FBI Boston NSGTF is investigating TONY CARTEGENA-CHACON ("CARTEGENA"), and JOHN LEE ANGEL ("ANGEL"), for violations of 21 U.S.C. Sections 841 (sale and distribution of controlled substances, specifically cocaine and fentanyl), and 846 (conspiracy to do so) and 18 U.S.C. § 922(g)(5) (illegal alien in possession of a firearm and ammunition)[1] (hereinafter the "TARGET OFFENSES"). On November 19, 2024, a federal grand jury returned an indictment charging CARTAGENA with distribution and possession with intent to distribute 40 grams and more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

---

[1] I am aware that CARTEGENA lacks status to be present in the United States lawfully.

5.     This affidavit is being submitted in support of an application of a search warrant for CARTEGENA's cell phone, a black iPhone 11 in black case, model A2111, IMEI: 351050540355195, (hereinafter "TARGET DEVICE"), which was seized from CARTEGENA upon arrest on November 21, 2024, and is located at FBI Boston Headquarters' Evidence Control Room, 201 Maple Street, Chelsea, MA, as further described in Attachment A.

6.     Based on the facts set forth in the affidavit, there is probable cause to believe that CARTEGENA has committed violations of the TARGET OFFENSES and that evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, as further described in Attachment B, will be found within the TARGET DEVICE.

7.     The facts stated herein are based on my own personal involvement with this investigation as well as from information provided to me by other law enforcement officers involved in the investigation. Because this affidavit is submitted for the limited purpose of securing authorization for the requested search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested warrant.

**PROBABLE CAUSE**

8.     On January 17, 2024, investigators conducted a controlled purchase of a Beretta semi-automatic .22LR caliber pistol and approximately 94 rounds of ammunition from CARTEGENA using CW-1.[2] CW-1 communicated with CARTEGENA via the TARGET

---

[2] CW-1 has previously provided information to law enforcement and has received financial compensation from law enforcement. CW-1 has admitted to substance abuse in the past. Information provided by CW-1 was corroborated to the extent possible and deemed reliable. Throughout this investigation, CW-1 communicated with CARTEGENA primarily in Spanish. A Spanish-speaking FBI linguist has reviewed the communications and provided a preliminary summary of the substance thereof. These recordings and messages were sent out for translation.

DEVICE to arrange the transaction and arranged to meet in front of the Metro PCS on Broadway in Chelsea, Massachusetts. Prior to the transaction, agents met with and searched CW-1 with negative results and provided CW-1 with $1,000 in government funds and an audio/video recording device and transmitter. Agents established surveillance in the area and observed a blue Nissan Sentra bearing MA Reg 3HDK27, which is registered to CARTEGENA, parked in front of the Metro PCS. Agents then observed CARTEGENA exit the Nissan and enter CW-1's vehicle. Surveilling agents observed CW-1 drive and park on Charles Street, where CW-1 and CARTEGENA remained for approximately ten minutes. The interaction was recorded, and investigators contemporaneously monitored it. During the interaction, CARTEGENA offered CW-1 the firearm and ammunition for $900, but CW-1 declined due to price. Surveilling agents observed CW-1 drop off CARTEGENA in front of the Metro PCS. Approximately six minutes later, CW-1 communicated with CARTEGENA via the Target Mobile phone, during which CARTEGENA agreed to sell the firearm and ammunition to CW-1 for $800. CW-1 and CARTEGENA subsequently met at the ScrubaDub Car Wash in Chelsea and conducted the transaction. The interaction was recorded. Following the purchase, investigators met CW-1 at a pre-determined location and collected a Beretta .22LR pistol, magazine, and approximately 94 rounds of ammunition, and $200 from CW-1, who reported that the transaction had occurred.

9.      Additionally, on or about February 15, 2024, investigators conducted a controlled purchase of approximately 50 grams of fentanyl from CARTEGENA using CW-1. CW-1 communicated with CARTEGENA via the Target Mobile Phone to arrange the transaction and arranged to meet in the area of Dunkin' Donuts in East Boston, Massachusetts. Prior to the transaction, agents met with and searched CW-1 with negative results and provided CW-1 with $3,000 in government funds and an audio/video recording device and transmitter. Agents established surveillance in the area. CW-1 picked up CARTEGENA by the Dunkin' Donuts, drove to Princeton Street, and conducted the transaction. The transaction was recorded, and

investigators contemporaneously monitored it CW-1 then dropped CARTEGENA off at 319 Bennington Stret, East Boston. Following the purchase, investigators met CW-1 at a pre-determined location and collected the purchased evidence and recording device from CW-1, who reported that the transaction had occurred. Investigators weighed the purchased substance and determined that it weighed approximately 53 grams. A field test returned a positive result for fentanyl. Investigators sent the substance to a laboratory for testing and analysis. The DEA laboratory subsequently tested and confirmed that the purchased evidence contained approximately 50.04 grams of fentanyl.

### Videos sent to CW-1 by CARTEGENA via TARGET DEVICE

10. On or about September 11, 2024, CARTEGENA and CW-2 communicated telephonically via the TARGET DEVICE. CARTEGENA advised CW-2 he was staying with his aunt in Reno, NV. CARTEGENA sent CW-2 videos of himself shooting what appeared to be an AR-15 style rifle with a scope and various semi-automatic firearms while in Nevada. I am aware that drug dealers commonly possess firearms, both for protection of their drug supply and for sale.

### November 21, 2024 Arrest of CARTEGENA

11. As of November, 2024, I believe that CARTEGENA was living at 21 Carmel Street, Unit 2, Chelsea, MA. On Thursday, November 21, 2024, pursuant to an arrest warrant issued in the District of Massachusetts, FBI Boston personnel located and arrested CARTEGENA in the vicinity of 299 Everett Ave, Chelsea, MA.

12. CARTEGENA was placed into custody without incident and transported to FBI Boston Headquarters, 201 Maple Street, Chelsea, MA for booking and processing procedures.

Located on CARTEGENA's person was his personal items including the TARGET DEVICE, which was seized by FBI Boston personnel.

13. After booking, CARTEGENA was brought into an audio and video recorded room for interview. CARTEGENA was advised of his rights in Spanish, which he acknowledged, and agreed to speak with investigators. CARTEGENA said that he purchased cocaine at 50 to 100 grams at a time from ANGEL but denied dealing fentanyl. CARTEGENA was shown a still photograph of himself from February 15, 2024, which CARTAGENA said was him. CARTEGENA also admitted knowing Maicol SORIANO as an associate of ANGEL; I am aware that SORIANO was arrested on Nantucket at the same time as ANGEL.

14. After the interview was concluded, CARTEGENA voluntarily provided FBI Boston personnel with the PIN to the TARGET DEVICE.

### Probable Cause to Believe that the TARGET DEVICE Contains Evidence, Fruits, and Instrumentalities of the Target Offense

15. Based on the foregoing, there is probable cause to believe that evidence, fruits, and instrumentalities of the Target Offenses will be found on the TARGET DEVICE.

16. As discussed above, CARTEGENA used a phone – likely the TARGET DEVICE – to commit the drug deal above. Accordingly, even though the last controlled buy was in February, 2024, there are likely records, such as call detail records, of those transactions on the device. In addition, based on my training and experience in general and the facts of this investigation in particular, I know that drug dealers frequently use mobile phones in furtherance of their criminal activity. Specifically, dealers use phones to contact sources and customers and store records of their drug dealing on their mobile phones. Such communications, moreover, may be by direct oral call, SMS or MMS, or by using a Web-based application such as WhatsApp.

17. Based on my training and experience, information provided to me by other law enforcement officers, and the investigation, including the controlled purchases detailed above, there is probable cause to believe that CARTEGENA is drug trafficker. Based on my training, experience, and information provided by other law enforcement officers, I know that firearm possession and drug trafficking are not mutually exclusive activities and that drug traffickers may possess, carry, sell, and/or purchase firearms, including to intimidate, injure, and threaten others or protect themselves during street transactions. *See United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989) (noting that firearms have become "'tools of the trade'" in drug trafficking and "thus are probative of the existence of a drug conspiracy" (quoting *United States v. Cresta*, 825 F.2d 538, 554 (1st Cir. 1987), cert. denied, 486 U.S. 1042 (1988))); *United States v. Williams*, 18 Fed. Appx. 1, 2001 WL 535739, at *2 (1st Cir. 2001) (evidence of firearms was properly admitted as probative of existence of drug conspiracy). Additionally, as described above, CW-1 conducted a controlled purchase of a firearm from CARTEGENA and CARTEGENA sent videos of a firearm in September, 2024.

18. As discussed above, the device is currently being stored by Investigators at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the Investigators' possession. The device was entered into FBI Boston Evidence Control in Airplane mode and with Wi-Fi and Bluetooth disabled.

19. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based

messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

20. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones, such as CARTEGENA's phone, are a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

21. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

22. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

   b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, electronic storage media often contains

electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

23. Based on the information described above, I have probable cause to believe that CARTEGENA violated 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 922(g)(5), as described above.

24. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the equipment described in Attachment A.

Respectfully submitted,

/s/ Brandon T. Amerine
_____
Brandon T. Amerine
Special Agent
Federal Bureau of Investigation



Sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 this ____ day of December, 2024.   December 16, 2024

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge

## ATTACHMENT A

### Property to be Searched

CARTEGENA's cell phone, a black iPhone 11 in black case, model A2111, IMEI: 351050540355195, (hereinafter "TARGET DEVICE"), which was seized from CARTEGENA upon his arrest on November 21, 2024. The TARGET DEVICE is pictured below:




The equipment to be searched is located at FBI Boston Headquarter's Evidence Control Room, 201 Maple Street, Chelsea, MA.

<u>**ATTACHMENT B**</u>

**ITEMS TO BE SEIZED**

I. All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 922(g)(5) from January 1, 2024 to the present, including:

    A. Records (including communications) and tangible objects pertaining to the following people, entities, physical addresses, vehicle, telephone numbers:
1. 18th Street Gang
2. John Lee Angel
3. Maicol Soriano
4. 21 Carmel St, Unit 2, Chelsea, MA
5. 319 Bennington St, East Boston, MA
6. Cell Phone Number 857-285-8780

    B. Records and tangible objects pertaining to the payment, receipt, transfer, or storage of money or other things of value by CARTEGENA, that relate to, or include monies derived from the sale and distribution of illegal narcotics and firearms, including:
1. Bank, credit union, investment, money transfer, and other financial accounts including cryptocurrency accounts or wallets;
2. Credit and debit card accounts;
3. Cryptocurrency accounts or "wallets";
4. Tax statements and returns;
5. Business or personal expenses;
6. Income, whether from wages or investments; and
7. Loans.

    C. Records and tangible objects pertaining to drug dealing, including
1. Drugs
2. Shipping orders and receipts
3. Packaging
4. Scales and other paraphernalia
5. Money, jewelry and other items of value
6. Firearms, ammunition and weapons

    D. Records and tangible objects pertaining to the residence and travel or whereabouts of Tony CARTEGENA;

    E. Records and tangible objects pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the crimes listed above;

    F.    For any computer hardware, computer software, mobile phones, or storage media called for by this warrant or that might contain things otherwise called for by this warrant ("the computer equipment"):
1. evidence of who used, owned, or controlled the computer equipment;
2. evidence of narcotics trafficking;
3. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;
4. evidence of the attachment of other computer hardware or storage media;
5. evidence of counter-forensic programs and associated data that are designed to eliminate data;
6. evidence of when the computer equipment was used;
7. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;
8. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

    G.    Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

II.    All computer hardware, computer software, and storage media. Off-site searching of these items shall be limited to searching for the items described in paragraph I.

III.    During the execution of the search of the TARGET DEVICE, if needed, law enforcement personnel are authorized to press the fingers (including thumbs) of CARTEGENA to the sensor of the subject device and/or to hold the device in front of their faces.

## DEFINITIONS

For the purpose of this warrant:

    A.    "Computer equipment' means any computer hardware, computer software, mobile phone, storage media, and data.

    B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such

as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**RETURN OF SEIZED COMPUTER EQUIPMENT**

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized TARGET DEVICE, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned

within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all information from computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.